Ethol, arguing on behalf of Ms. Erika J. Thomas. Thank you. Mr. McGuire, you may proceed. Yes. First, I want to thank the Court for allowing me to make my argument while seated at this table, as opposed to standing up there at the podium. I spent the first 75 years of my life without ever breaking a bone or fracturing a bone, and then some three years ago I did so, and it's been a continuing problem. So I thank the Court for its courtesy. You're welcome. No problem. I thank you, sir. This application for disability pension to the Firefighters Pension Fund was the first application for a disability pension that had been heard by the pension fund. It's a newly organized department, becoming a full-time department, which meant that they could have a pension fund. The next point I wanted to get across to the Court is this is an application for a line-of-duty disability pension, or in the old term, a not-in-the-line-of-duty disability pension. I'm going through these matters very quickly because I'm aware that the Court has read the briefs, and I just want to point out some points to answer any of your questions or prompt any questions you may have. When she applied for a disability pension, Lieutenant Sarah Naden was a full-time member of the fire department as a lieutenant and also was a paramedic. She still is a member of the debauchess. She has not resigned. She has not been terminated. She has not been ordered to return back to duty. Does she do any paramedic work, or everything has been suspended? Everything has been suspended. The position of a lieutenant in the fire protection district is the equivalent of a sergeant in a police department, first-line supervisor. She is not what some people might refer to as a paper shuffler sitting at a desk. She is on the engine. She is in charge of the shift to which she is assigned as a supervising officer. She started as a part-time firefighter, a part-time paramedic, a volunteer. I should phrase it better. A volunteer as opposed to part-time. She was promoted to the rank of lieutenant while a volunteer. Then the department became full-time. She applied for a full-time position with the fire department, and she was granted a full-time position. Subsequently, she was promoted to the rank of lieutenant, and immersed in the rank of lieutenant was her supervisory responsibilities and also her paramedic duties. There was no psychological testing for the position for which she applied and was accepted. The issue here comes down to did the discrimination of Lieutenant Sarah Dayton by her subordinates cause her to become disabled? Our position is yes. I would point out to the court that there is a job description for the rank of lieutenant. She had the obligation to abide by those duties. She was not allowed to abide by those duties by way of the discrimination she encountered within the department. Were there rules of conduct for the membership of the department including Lieutenant Dayton? The answer is yes. Were those rules of conduct applied? The answer is no. When she complained about the discrimination that she was receiving from her subordinates on her shift, she submitted a 16-page letter at the request of the then fire chief wanting to know what it consisted of. Management did not do anything regarding that 16-page letter. That could have gone before a different board, but that was suspended at her doctor's request, correct? The pension board doesn't deal with this issue. That would be the police or the fire... The equivalent of the board of fire and police commissioners. Right, commissioners. Thank you. You're welcome. So they're not one and the same in this particular Sugar Grove area. What this case comes down to, Your Honor, is the chicken or the egg. What came first? When she was hired as a volunteer, when she was promoted as a lieutenant, she was able to do the job. And then once she becomes full-time a lieutenant, full-time paramedic, Now we have the hostility of the members of the department as reflected in that 16-page letter. The significance of that letter is that the then fire chief requested details as to this discrimination. Pursuant to that order, that 16-page letter was written and received by the fire chief. Yet the fire chief did nothing regarding the matters mentioned in that 16-page letter. Nor did the governing body of the district do anything about that 16-page letter of Lieutenant Nathan. Didn't they set it down for a hearing or give her an opportunity for a hearing? She requested the chief to look into it. She requested the board of trustees to look into it. Neither of them did it. So there was never a hearing scheduled? Correct. Okay. What might be confusing is that there was an order given to Lieutenant Dayton to show up for a formal interrogation pursuant to the Firefighters Disciplinary Act. Now notice, she's the complainant. She is being ordered to show up for a formal interrogation. She's the victim. In the knowledge that was given to her, she was basically told that she might be subject to discipline as a result of this formal interrogation. You say that she was told she might be? Was that in the letter or was that something that she concluded on her own? It is in the letter, I believe. Otherwise I wouldn't say it. But the bottom line is, if you look at the Firefighters Disciplinary Act, it does state it in there that the results of a formal interrogation can be used for disciplinary purposes. Yet she's the victim. There was no need for that kind of a formal letter, formal interrogation notice to be given to her, and yet it was. How did her disability manifest itself? Chick or yay? You want it scrambled or you want it easy over? She started off as a conscientious, dedicated person, which is why she volunteered and why she was promoted. Then when she becomes a lieutenant and all of the people on her shift were males, constant bickering with her. I shouldn't say bickering, that's not the right word. Constant criticism of her. She could do no good. She could not do the job for which she was hired. As a result of that, she went to see a medical doctor. That medical doctor's name was Johnson. Johnson saw her for the physical problems that she was encountering as a result of this discrimination. Then Dr. Johnson realized that there might be more to it in the sense of psychological or mental. As a result of that, she was directed to see a clinical psychologist by the name of Jessica Novak. Jessica Novak recognized that what was happening to her was denigrating her to the point where she lost her self-confidence. She was having physical problems. The medication that Dr. Johnson recommended she couldn't pay because she wasn't covered by the hospitalization. So I said, how did it manifest itself? Lack of self-esteem, lack of confidence. And then the question I think the court has to ask, under these circumstances, would you want a lieutenant like Sarah Baden to respond to a call of service issued by one of the three of you? In this 16-page letter, she goes to three of her team or the members of her shift and said, look, you guys are all trained. They're not training me at the executive level, so to speak. Would you provide me training? And I think she says something like, sometimes I'm not sure I know my own something. And they say, sure, we'll train you. But then she walks into the squad room and they're all talking about her. And she goes to one of them and says, why are you saying these things about me? And he says, well, you just admitted you're not trained and you don't know your own backside from somewhere else. Is it more a matter of training or the fact that she's a woman that seems to be the problem? Because it looks like all of the younger hires that they brought in upon making this department full-time probably had training, which she didn't have the type. She doesn't have a certification, I believe, from one of the schools that does it. And most community colleges today do that. And she was fighting fires and learning almost on the job as a volunteer. But now all of these new trainees are coming in. And they were complaining that she didn't know what she was doing. So she asks them for help and they turn it around on her. So is it a matter of training or is it a matter of the fact that they are all male or both? I would say it's more all male because she did have the life experience of being a lieutenant. She was the only female on that shift which she was in charge. And this may seem strange when I say it, but there was an obituary on a person by the name of Davis within the last week. And he was the retired fire chief of Evanston. And he was the first African-American member of the Evanston Fire Department. And when he reported for duty, they gave him one devil of a hard time. They would not sit down and eat with him. They would hide his eating utensils. And that's just two of the items mentioned in the publication. Now, Davis had the internal fortitude to stick it out and to his great credit became the fire chief. Well, they couldn't. She couldn't put up with this discrimination, the nitpicking. And it lowered her self-esteem to the point which I wouldn't want her as a near traffic controller. Well, that would be even harder than maybe where she was. But all right, let's talk about disability because I'm not exactly sure what it means. We have several doctors saying she is disabled because of the circumstances in this department. However, she could go and work somewhere else and do this job. So, I mean, it comes to the if you're disabled, you're disabled. If you broke your bone, you broke your bone. It isn't like you broke it one day and, you know, for the next activity, oh, my leg isn't broken. But so what is a disability under this statutory authority? Please go ahead. To answer your question in as few words as I can. You can use more than a few. Your question, as I understand it, is what's her disability? No, what is a disability under the statute? Not hers. A. Inability to do the job. Because of a psychological or mental problem combined with a physical problem, that's what she had. Anywhere or in this department? Anywhere. Because the pension code refers to most fire departments of the size of Sugar Grove. This is not a case where she just wanted a pension to coast. Because keep in mind, she has to be annually reviewed for it to see if she continues on. It got to the point where, quite frankly, she couldn't put up with it anymore. And she went for an FMLA leave. Didn't work. She went to Dr. Johnson. She went to the other doctors that are mentioned in the brief. Hopefully that answers your question, Justice. Well, what if she went under the recommendation of some of the doctors? What if she then said, okay, I'm going to go over to the Woodstack Fire Department and I'm going to apply as a fireman, fireperson, and they took her? Is it because she's a lieutenant and can't do that job or she's a fireman and can't do the job? I would say it's the environment that she encountered in Sugar Grove, which we cannot exclude as not being applicable to any other fire department. Women in the fire service are a rarity. And I look upon this as jealousy, if you will, on the part of the members of her shift and the members of our own union that we have a lieutenant who's a woman. Well, we had two. There were two women on the department. But they were able to put – I'm sorry, I interrupted. Well, there were two women at the time she was there. That is correct. But they were able to put up with it and she was not. I would point out to the court that when she was asked by the attorney for the pension board whether or not she could do the job, she said something to the effect that's quoted in my brief. I'll dumb this down for you. If you're asking me can I put the fire out, the answer is yes, but not under the circumstances where, quite frankly, I can't trust them, they don't trust me, somebody's going to get hurt. That's the where job which causes the disability. Could she encounter it in another fire department? Certainly she could. Hopefully that answers your question. Thank you. Thank you, sir. You'll have an opportunity to make rebuttal. Mr. Mazzullo, do you have five minutes? Or does Ms. Thomas wish to speak first? Yeah, we can bring Mr. Mazzullo to the stage. Good morning, Justices. Jerry Mazzullo on behalf of Local 4748 in this matter. First of all, I'll begin, as I'm more than capable of doing, just start speaking and spewing. As most attorneys are, do the Justices have any initial questions for me? What was the purpose of the union's request to intervene? What was the real purpose? Correct. So the real purpose was, and that goes into the beginning of my statements before you, what you have before you between the pension board and the applicant is this discussion of what is an active duty, has this individual met the standard, you know, manifested the evidence issues, your kind of traditional was this against the evidence to deny the pension. The Local 4748, this was a procedural matter. So at the end of the day, what had happened was that the circumstances here is as the pension board proceedings take place and begin to shape up or take place, the applicant subpoenas multiple members of the fire department, which are members of the bargaining unit. Yes, it's she, isn't she? She is. Oh, absolutely. She is a member of the bargaining unit, a member of the fire department. There are these allegations that before the pension has been filed, no member of the bargaining unit has ever been interrogated. No member of the bargaining unit has ever been accused by the department. We have this 16-page letter. This investigation is withdrawn or placed on the bands by the chief. The bargaining unit is going on as its business, protecting the members who protect the citizens of the fire protection district. So now there are these subpoenas that are issued in which there's going to be claims that it's sexual harassment by bargaining unit members that are causing this individual to apply. And because that could potentially lead to discipline, or we don't know quite honestly at that point where this is going to lead or whether or not these transcripts are going to be given directly to the employer who's never seen fit to bring anybody in for a formal interrogation before, we then file our petition to intervene. I don't know whether or not that would have been effective, Justice. Is Moran a member of the bargaining unit? Moran, yes, is a member of the bargaining unit. And he was a member of the bargaining unit, and he has been the chair of this department pension board probably since its inception, right? That I'm not sure, Justice. I don't know. But he was at the time she filed her request. That's correct. And there was an action that was taken against him and was put in the file. He did recuse himself, Justice. Is that what you're getting to? Did he really? I believe he did recuse himself. Oh, he did not recuse himself. I'm sorry. He did not. So if he is part of the bargaining unit and he is there at the very beginning, why didn't you seek to intervene at the very beginning? Because he was a member of the pension fund. And he had complaints against him, one that had actually been acted upon. So why didn't you want to protect him? Because according to the case law, all pension trustees are considered to be fair and impartial as they sit on the pension board. And it would be up to the applicant to determine whether or not you wish to ask this individual to recuse himself. She's also made complaints in the 16 pages about Nichols and Warner. Correct. And again, no request was made, and it's because they're considered to be fair and impartial? That's correct. All pension board trustees are considered to be fair and impartial. And in fact, then they're asked, if the applicant has an issue with these individuals, and again, somebody who represents pension boards routinely, do you think that you could be fair and impartial? It's up to that trustee to recuse themselves. So those individuals, those trustees that are on the board, they would not have been the individuals making statements under subpoena that could potentially have been led to discipline. Whether there were separate formal interrogations by the employer or anything along those lines, they would have brought these three individuals that you mentioned in, and I would have stepped in as union counsel with the union president, pursuant to the Fire Disciplinary Act, go ahead and ask your questions. But because these individuals were being brought in to testify, unlike these three individuals of which you previously stated, then we were like, well, they're going to be giving statements here. Those statements could potentially be used as discipline. And that's why we filed the petition to intervene. And as you know from the record, we were granted, the way it was shaped was, you're not allowed to put any evidence in, can't ask any questions, anything along those lines. You're there to just potentially make objections or anything along those lines, et cetera. And it was cured because, as you know from the record, the applicant didn't bring a single person in. The applicant rested without bringing anybody in to testify. Was there a motion to exclude witnesses during the course of this particular hearing? We didn't participate in the hearing. That would be a question for my colleague because we didn't participate in any meaningful way. But your clients or members of your bargaining unit were likely to be witnesses as it started. So did anybody make a motion to exclude them from the hearing room so that she could testify without, as we do in other cases, without them listening to her testimony and then adjusting theirs accordingly? The union did not, and the union did not actually even attend the hearing in any meaningful way because once these individuals were not called to testify, there was no reason for us to attend, which is why you'll see in the briefs, we didn't take a position one way or another. We were worried procedurally about potential disciplinary issues under the Fire Disciplinary Act. Whether or not our bargaining unit member gets the pension, we're supportive of her. We're supportive of our bargaining unit members. We don't take a position either way. We let the pension fund and the applicant deal with it. Our main concern was what may happen and how this may spin off. Thank you for your time. Thank you for letting me go home and work. Ms. Thomas? Thank you. Thank you for your support. First of all, I'd like to start by clarifying this is not a discrimination case. This is a disability case. Mr. McGuire summed it up for the court earlier today. He said the issue here is did discrimination cause Ms. Nadine to become disabled? Well, he's used the term chicken and egg a couple of times here this morning. This is kind of putting the car before the horse if we want to get into a bunch of colloquialism. You need to make a determination about whether she was disabled before you look into the cause of her disability. And I would suggest that the record here indicates that the board went out of its way to try and keep its eye on the ball here. To try and determine whether or not she was in fact disabled. And once they made that determination, if the cause of her disability was something that was an act of duty. And really that's what it boils down to here. Other than the beginning of her statement, let me dumb it down for you. Which was probably not as well placed as it should have been. She specifically talks about why she can't do this job. Now, why, I mean I don't see anything really noted other than when they do their 20 page or however many pages decision. The doctor said this, the doctor said this, the doctor said this. It's not talking about her. Why don't they really, I mean she said what the problem was. And they appear to have said it's not an issue. Well, I think to just take her comment, I can't do this job, without really looking into what she actually said doesn't do this matter justice. And I think it goes to show how deeply the board did consider the matter. But one of her doctors, the doctor who then testified backed her up on it, said that this was a serious problem for her. She had lost her ability to bleed. Which is her primary job in this fire department. Her primary job in that fire department was to be a firefighter. And she repeated over and over in this record, I can do the job. Give me a hose, I can fight the fire. I can do this job. The doctor said she could do the job. Her question, and she was even asked, well, how about if you take a demotion and become a firefighter instead of a lieutenant. If your real issue was whether you can lead these people. And she said, well, I thought about that, but I don't trust these people. Now, I don't see anywhere in this, in the job description of firefighter trust. You have to work with people. You have to be skilled. You have to be able to climb a ladder. You have to be able to lift a certain amount. And her comment was, I can't trust them. Well, if you can't trust the people you work with, that doesn't mean you can't be a firefighter. That means that you can't work with the people that you're working with. Well, you know, I see that issue, but I also see the fact that, you know, and I do trust both of them. But if I don't trust Justice McLaren and Justice Jorgensen, I can still do my work and I can dissent or I can disagree with them. But they're not going to leave me in a fire to die. I mean, that's, it's a different part of the job. And so, you know, you have to look at how that statement relates to what she does. So how does that statement, I can't trust them, relate to running into a burning building? Well, the question is, is there anything to back up that statement? Yes, she walked into the break room and they were talking about her lack of training. And they couldn't trust her. And they couldn't trust her. But I think you're undercutting the, I guess, the brotherhood of the firefighters. I cannot ever imagine a firefighter who would let someone, their homeworker, another firefighter, put themselves in peril because they didn't like them or because they didn't trust them. It doesn't matter who you are. If you're in a position of peril as a firefighter, they're going to run in and try and save you. I mean, they do it for strangers all the time. They're not going to let somebody burn up in a building or somebody put themselves in danger. There was nothing that Ms. Hayden could point a finger at to say, well, I, you know, yes, they question my authority. Yes, they don't like the way I do things. Yes, I asked them for training and they're turning it around on me. But there was no incidence where she said, I was in peril and they didn't back me up. There's nothing like that. And quite frankly— What symptomology of her disability manifested itself, if any? Well, that's an excellent question because there wasn't any. She out of the blue walked into the chief's office and said— Well, did she stutter? Did she have panic attacks? Did she have moments of incoherence? Was her state of depression such that she vegetated? I mean, what happened? There was nothing on the job that ever happened that anybody can point to, including her, that caused her to be unable to perform her duties. It was a shock when she walked into the chief's office and asked to go on leave. And he said, well, what do you mean? Why do you want to go on leave? And then she came up with this 16-page letter of all these things that had been going on. Prior to that, there was no indication. There is one. She had had a complaint that was investigated against the chairman of this particular pension board, which is something I would like to talk about as well. But you can finish your answer here, Justice McClain. Well, and I'm talking about a physical manifestation. I'm not talking about, you know, the other complaint. But there was no indications that she had a panic attack while on the job and she couldn't perform her duties. There was no indications that, you know, she was rendered into a vegetative state and was unable to leave or do her job. Her complaints were that people were not listening to her and were not following her directives. That was her complaint. It wasn't a physical or to the point where her mental state was disabling to her that she couldn't do the job. There was never any of that. The record is absolutely silent on that. All right. Let's go to, I don't know if he's a captain by the time of this or if he's still a lieutenant, but there was a request. There was some concern about Moran being the chair of this. And then if you look at the letter, Nichols and Warner are also mentioned. However, I understand that the makeup of these pension boards relates to the department or the entity that is at issue. So getting past that particular statutory authority, Moran had a complaint filed against him. It was, according to the then chief, he received a talking to and something in his file. Why wouldn't he on his own not say, I'm not going to hear this? Well, again, you know, this was an issue of disability. And I would argue that it was Ms. Nayton's responsibility to say, look, Mr. Moran, Lieutenant Moran, Captain Moran, whatever you have to be at the time, you were a subject in my letter. I don't think you can be fair or impartial. What do you think? And it was up to her to raise that. But then they went into executive session, as I recall the process. And the attorney, and I don't know if it was you or one of your colleagues, was with them. And they went into executive session. They discussed Mr. McGuire's issue on that regard and came back out and said Moran's staying. I don't believe they ever asked to recuse Moran. No, they brought it up and said, I know McGuire brought it up. He may not have followed up, but he raised questions. And after the conversation in executive session, which they're entitled to do, we don't know why Moran's staying. We don't. Moran did not make any, I can do this, like we talked to jurors. I know you've had this problem in your life, but can you be fair? And you need to be honest. And the juror sits there and, yeah, I think maybe. That didn't happen here. He didn't say I can be fair. He just went on with the show. Well, I would assert that it wasn't, the issue wasn't framed in the manner of can you be fair and impartial in this case. I, you know, it was, there were a lot of things that were raised in a very. Oblique. Oblique manner. And for the board to have, they tried to address everything they could. Go ahead. Thank you. They tried to address everything they could, and they took things as they came. You know, if this was an issue that Ms. Nadine felt was so crucial, then she should have really pursued it. And there was an issue about the chief when he was going to be, to testify. That was an issue. But then when she didn't call him, that issue was declared removed. There was an issue about, I believe it was Nichols, who was asked to consider the union's petition to intervene. And they asked him, and he sat down on that issue. So there were, when it was properly raised and when it was properly framed, the board did what it needed to do. And as Mr. Marzullo commented, you know, these board members are presumed to be fair and impartial. And if Ms. Nadine felt so strongly that Mr. Moran was not going to be able to sit as a fair and impartial fact finder on the disability, and we're not talking about a discrimination here, this was solely her disability, then she should have pursued it. Well, I think the reason, at least the spoken reason on the record is Mr. McGuire didn't want a two-two tie, which would have been of no use to her, and apparently there was no substitute available. And that was with regards to the chief testifying. I believe she ended up not calling the chief for that reason. But really, as far as Mr. Moran goes, it was very vague, and it was not properly pursued or raised. One more question. When we talk about disability, if you look at the statute, it says disability to do the work in the department. I ask the same question of Mr. McGuire. Is this a disability, are they to be determining a disability in any department or in the Sugar Grove Fire Department? I would argue that the intent of the statute is you're unable to perform the duties of a firefighter, period. You can't do it in this department, you can't do it in any department. And in this case, I would assert that Ms. Nadine repeatedly said she could do the duties of a firefighter, but she didn't like her co-workers and couldn't trust them. I don't have anything else. Thank you. Thank you very much. Mr. McGuire. One of the points not mentioned in the briefs was that the fire department did not reassign her. She mentioned to them that she had a problem with people on a shift. She sought help. She could have been reassigned from a line position to a staff position, but she wasn't. She was not offered or she did not ask? She did not ask and she wasn't offered. Not mentioned up to this point is Compton, the former fire chief of Sugar Grove, who was a retired member of the Aurora Fire Department as a deputy chief. And the significance of his testimony is you have to have a cohesive unit to be a fire department, to do the job. Now, there's no question that my client said, yes, you can pick up the hose and put out the fire. But she's a lieutenant. She's in charge of a shift. She's supposed to be directing her subordinates. The subordinates are hostile towards her. We could call discrimination or harassment. That's what she was faced with. Pension boards, as the court well knows, are deliberately construed in favor of those who benefit. You said they were hostile, is that correct? Yes, as stated in the letter. What about insubordinate, in the sense that they failed to follow orders or instructions? Yes, they were. Did she report them? She did not, and she testified the reason she didn't was because she didn't want a bad situation to get worse. Hopefully that addresses the question. Mr. McGuire, why didn't you pursue the request to remove Moran from the position, from on the board? I was stuck with that board. There is no provision for a change of venue, change of composition. That board, how they get on the board is they've elected or appointed. I could ask that he remove himself, but quite frankly I took the position, hopefully he'll rise to the occasion. And we'll look at this conscientiously, objectively. And that did not happen. That is why, members of the court, I did not object to the pension board at the very beginning. I knew I had an uphill battle. We have two members of the board who are union members. You've got two trustees who are members of the board. And then you have the present fire chief. I had an uphill battle and I decided to let's hope they rise to the occasion and do the job. Theoretically, they did not. That's our position. And let me address Mr. Marzullo's comment on regardless union. You look at that disciplinary act. There's no provision in that disciplinary act for potential, for potential. And that's what it all came down to. I had subpoenaed the members of the fire department to testify. They were there. But then the union comes in and they're represented by counsel. That limitation that the pension board put on the union did not prohibit Mr. Marzullo from objecting to questions as asked. Also, I had to presume they would be rehearsed. I couldn't take that chance. I asked that the members of the fire department that I had subpoenaed be excluded from the hearing while she was testifying, Lieutenant Maiden, about a condition. That was refused. By whom? The board. Mr. Marzullo said he didn't participate in that aspect. Is that correct under your understanding of the situation? No. And the reason for that is, first of all, he was allowed to intervene when he had, as I see the law, no right to intervene. And the second point is they put limitations on him, but they put no limitation on whether or not he could object during the course of the testimony. I couldn't afford to take the chance of putting his clients on the stand. How are we supposed to determine that there's any prejudice if you didn't make an offer of proof? The offer of proof was the composition of the board under the circumstances of this case. Who's been involved in this case? You've got the union being accused because the union contract has a prohibition on sexual discrimination. You've got the fire protection district who, if there is discrimination or harassment, will have to pay the migrant. That's my answer. Any other questions? No. Thank you. We will take the case under advisement. This is the last case on the call. Court's adjourned.